**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**MARK A. SMITH,**

        **Plaintiff,**

                                **Case No. 1:18-cv-242**
      **v.**                      **JUDGE DOUGLAS R. COLE**

**ADVANCEPIERRE FOODS, INC.,**

        **Defendant.**

**<u>OPINION AND ORDER</u>**

This cause comes before the Court on Defendant AdvancePierre Foods, Inc.'s ("APF") Motion for Summary Judgment. (Doc. 22). For the reasons below, the Court **GRANTS** APF's Motion, **DISMISSES WITH PREJUDICE** Plaintiff Mark Smith's claims, and **DIRECTS** the Clerk to enter judgment accordingly.

**BACKGROUND**

APF, a subsidiary of Tyson Foods, manufactures fully cooked chicken and beef products. (Chernock Decl. at ¶¶ 5, 6, Doc. 20-1, #290). Smith began working for an APF-predecessor as a non-supervisory Maintenance Technician in 1992. (*Id.* at ¶ 7, #290; Smith Dep. at 25, Doc. 19-1, #86). Three years later, in 1995, APF promoted Smith to Maintenance Supervisor, a position he held for roughly 22 years, until his termination on February 18, 2017. (St. Pierre Decl. at ¶ 24, Doc. 21-1, #305; Smith Dep. at 26, #86). At the time of his termination, Smith was 56 years old. (Smith Dep. at 180, #124).

For most of the year leading up to his termination, Smith reported directly to Patrick St. Pierre, the Manager of APF's Maintenance Department. (Chernock Decl.

at ¶¶ 9–12, #291; Smith Dep. at 31–32, #87). St. Pierre also managed three other Maintenance Supervisors: Michael Mason (age 40), Timothy Taylor (age 58), and Michael Malott (age 31). (Chernock Decl. at ¶ 13, #291). St. Pierre joined APF in February 2016, and immediately began an overhaul of APF's Maintenance Department, transforming it from a "reactionary organization" to a "proactive, preventative, predictive Department" focused on "Preventative Maintenance." (St. Pierre Decl. at ¶ 5, #302). To that end, St. Pierre coached the Supervisors on Preventative Maintenance. (*Id.* at ¶ 6, #302–03). He required Maintenance Supervisors to perform daily inspections of machinery so that issues were identified and remedied before a machine broke down to avoid stalling the entire manufacturing process. (*Id.* at ¶¶ 6–7, #302–03). So, to St. Pierre, it was essential for Supervisors to plan, schedule, and prioritize proactive—rather than reactive—maintenance work on APF's manufacture and supply machines. (*Id.*).

By June 2016, about three to four months after implementing the Preventative Maintenance initiative throughout APF's Maintenance Department, St. Pierre began verbally coaching Smith regarding his performance. That was because, according to St. Pierre, Smith did not follow the Preventative Maintenance requirements. (*Id.* at ¶ 8, #303). In St. Pierre's view, Smith, given his talent and experience, possessed the technical and institutional knowledge of the production floor's machinery, but he continued to struggle with the new supervisory duties of planning, scheduling, and reporting that the Preventative Maintenance initiative required. (*Id.*; St. Pierre Dep. at 45, Doc. 19-2, #193). Smith also had trouble ensuring that the technicians who he

2

supervised had completed the necessary daily work that the new initiative required. (St. Pierre Decl. at ¶ 8, #303). To Smith's credit, though, he was on "first shift," which St. Pierre acknowledged was more active than the two other shifts and so required Smith to perform duties that were "too much" for one person. (St. Pierre Dep. at 46, #194). This overly burdensome workload caused Smith noticeable stress, which St. Pierre acknowledged and offered help to manage. (*Id.* at 45–46, #193–94).

Despite St. Pierre coaching Smith on stress management and job performance throughout June, July, and August 2016, though, Smith's execution of his Preventative Maintenance duties did not improve. (St. Pierre Decl. at ¶ 9, #303; Chernock Decl., Ex. A, #297–98). So, in August 2016, St. Pierre decided to issue Smith a Performance Improvement Plan ("PIP") to address his ongoing performance problems. (St. Pierre Decl. at ¶ 9, #303). But before St. Pierre could issue Smith the PIP, Smith took FMLA leave beginning on August 26, 2016, due to high blood pressure, stress, anxiety, and depression. (*Id.* at ¶ 9; Smith Dep. at 143, #115). There is no dispute that APF approved Smith's leave request. (Pl.'s Mem. in Opp'n at 3, Doc. 26, #337). While Smith was on leave, St. Pierre moved Michael Mason, another Maintenance Supervisor on a different shift, to cover Smith's position. (St. Pierre Dep. at 47, #195).

Smith returned from leave about two months later, on October 24, 2016. (Smith Dep., Ex. 2, #129). Upon Smith's return, St. Pierre kept Mason on Smith's shift, i.e., first shift, so that those two were Co-Supervisors with equal responsibilities. St. Pierre testified that he hoped this would alleviate Smith's previous overload.

3

(St. Pierre Dep. at 46–49, #194–97). St. Pierre clarified that Mason did not replace Smith, but rather Mason "became the second guy that we needed." (*Id.* at 48, #196). Mason supervised production lines one through five (which were smaller lines), and Smith supervised lines six through ten. (Smith Dep. at 105–06, #106).

St. Pierre then issued the PIP to Smith four days after his return, on October 28, 2016. (Chernock Decl., Ex. A, Doc. 1, #295; St. Pierre Decl. at ¶ 11, #303). The PIP listed goals for Smith's improved performance on Preventative Maintenance completion and leadership. Those goals focused on work environment safety, production line efficiency, effective communication between Maintenance Supervisors, and proactive daily management and scheduling. (St. Pierre Dep., Ex. G, #285). Under the PIP, Smith had 45 days to achieve sufficient performance, or otherwise "be subject to termination." (*Id.*).

St. Pierre avers that, "[d]uring the PIP process, Smith took virtually no initiative to meet his established goals relating to [Preventative Maintenance] completion." (St. Pierre Decl. at ¶ 12, #303). So, around the time that Smith's PIP expired (in mid-December 2016), St. Pierre mandated daily Preventative Maintenance inspections for the entire Maintenance Department. (*Id.* at ¶ 16, #304). St. Pierre informed Smith and the other Maintenance Supervisors of the new requirement, which Smith then agreed to enforce upon his team. (*Id.* at ¶ 17).

Smith's 2016 Goals and Performance Review, which St. Pierre and Smith both signed on February 6, 2017, confirmed that 2016 had been a difficult year for Smith's work performance. In the review, St. Pierre wrote that, although Smith "made a

strong effort to change and made changes towards [APF's] strategic direction[,]" he failed to effectively communicate with other Maintenance Supervisors, did not properly promote the Preventative Maintenance initiative to his team members, and did not hold his team accountable for failing to complete actions. (St. Pierre Decl., Ex. D, #278–80). Nevertheless, St. Pierre concluded Smith's review by writing that he was "[l]ooking forward to a great 2017." (*Id.*).

Later that week, though, on February 10, 2017, a bolt fell off a machine in one of the production lines that Smith was responsible for supervising, and, as a result, APF had to shut down that machine. (St. Pierre Decl. at ¶ 20, #304). St. Pierre immediately asked Smith for a summary of that line's daily inspection so that he could determine whether anything had been out of place. (*Id.*). No one had inspected the machinery that day, however, so Smith could not produce the requested summary. (*Id.*).

In an effort to address Smith's apparent failure to ensure that his team was conducting the daily inspections that St. Pierre had ordered, Smith held a meeting with the first-shift Maintenance team. (*Id.*; Smith Dep. at 89–92, #102). St. Pierre also attended. (Smith Dep. at 89–92, #102; St. Pierre Dep. at 60, #208).

There is conflicting testimony about what exactly Smith said during the February 10, 2017 meeting. According to Smith, he told the first-shift team members that the mechanics needed to complete a daily inspection checklist by the end of that day and that, beginning the next Monday, "[w]e have to do them daily, you know, whether we agree or not … ." (Smith Dep. at 89, #102). In his deposition, Smith

acknowledged that his team had not been performing daily inspections, contrary to St. Pierre's orders, and explained that the mechanics "were bucking and didn't want to do it." (*Id*.).

In Smith's view, requiring the mechanics to inspect the equipment in the morning when they were "trying to start up" was "very taxing on them." (*Id*. at 90, #102). According to him, in the three weeks leading up to the February 10th meeting, he "was trying to ease" them into the system. (*Id*. at 90–91, #102). But, Smith testifies, he put his foot down at the February 10th meeting and explained to his team that the "wean-in" strategy had ended and so the mechanics had to perform the inspections each morning. (*Id*. at 94–96, #103).

Smith's notes from that meeting, however, seem to indicate that he planned to *begin* the "wean-in" process at the February 10th meeting, as his team had not been performing the daily checklists up to that point. He wrote that, on February 8, 2017, "I discovered that [the mechanics] were not completing the daily check list [sic] that was mandatory per … St. Pierre." (Smith Dep., Ex. 2 at 2, #130). So, Smith writes, he raised the issue at the February 10th meeting. (*Id*.). More specifically, he continues, after "address[ing] the mechanics regarding the daily checklist, they expressed how they were unable to complete the task without compromising start-up." (*Id*.). In response to his team's stated concerns, Smith apparently tried to "wean-in" the required checklist and thereby balance the demands of St. Pierre with the concerns of the mechanics. (*See id*. ("Without overwhelming the mechanics, as well as

compromising startup, we were trying to find a solution to be able to complete these daily checklists.")).

Smith's written account is more consistent with St. Pierre's version of the February 10th meeting. St. Pierre testifies that, at that meeting, Smith told the Maintenance Department's first-shift team that they did not need to prioritize Preventative Maintenance (i.e., the daily inspection checklists) and that they instead needed to focus on "corrective work." (St. Pierre Dep. at 61, #209). St. Pierre further claims that Smith instructed his crew members that they only needed to perform the inspections at least once per week and that they were permitted to start an assembly line each morning, even if it had not been inspected that day. (St. Pierre Decl. at ¶ 22, #306). So, in St. Pierre's view, Smith's comments to his crew at the February 10th meeting directly defied St. Pierre's instructions and ignored the Preventative Maintenance initiative that St. Pierre had been trying to implement for months. (*Id.* at ¶¶ 5, 6, 22, #302, 306; St. Pierre Dep. at 62, #210).

Immediately following the February 10th meeting, St. Pierre privately confronted Smith in St. Pierre's office, telling Smith that he was not authorized to change the frequency of the Preventative Maintenance inspections. (St. Pierre Decl. at ¶ 23, #305; Smith Dep. at 101–02, #105; St. Pierre Dep. at 63, #211). St. Pierre then sent Smith home. (St. Pierre Decl. at ¶ 23, #305; Smith Dep. at 101–02, #105). Both Smith and St. Pierre claim they were confused about what had just happened during the meeting. St. Pierre could not believe that Smith would openly contradict him in front of the Maintenance Department's entire first-shift crew, especially after

7

(according to St. Pierre) Smith had recently "turned the corner" on resisting the initiative. (St. Pierre Dep. at 62–63, #210–11). On the other hand, Smith was "dumbfounded" that what he had said at the meeting caused St. Pierre to send him home. (Smith Dep. at 101–02, #105).

The next day, on February 11, 2017, Smith called APF's Senior HR Manager, Renee Chernock. (Chernock Decl. at ¶¶ 3, 25–27, #290, 292; Smith Dep. at 107–08, #106). Smith "vented" to Chernock about his frustration regarding the fallout of the February 10th meeting with his Maintenance technicians; particularly focusing on the fact that, after the meeting, St. Pierre had sent him home for the day. (Chernock Decl. at ¶ 25, #292). Smith testified at his deposition that he also raised concerns to Chernock about APF engaging in age discrimination against its employees. (Smith Dep. at 107, #106). More specifically, he stated that he complained to Chernock about APF's Plant Manager, Chris Gosney, discriminating against him and other APF employees because of age. (Smith Dep. at 116–36, #108–13). (At one point in Smith's deposition, though, he said he did not remember if he did in fact say anything about Gosney to Chernock, but that he knew he had discussed his concerns about Gosney with someone. (Smith Dep. at 115–16, #108). Chernock, for her part, testified that Smith had never raised any concerns about age discrimination with her and did not mention such concerns during the February 11, 2017 phone call. (Chernock Decl. at ¶¶ 26, 27, #292).)

At some point during the week after St. Pierre sent Smith home, St. Pierre decided APF must terminate Smith's employment. According to St. Pierre, he arrived

at that decision because, even after Smith's PIP had ended, Smith struggled to shift his focus toward the Preventative Maintenance initiative. (*Id.* at 54, #202). And the "last straw," St. Pierre says, was Smith's open defiance of that initiative at the February 10th meeting. (*Id.*).

Having made up his mind, St. Pierre presented his decision and Smith's PIP to APF's HR Director, Mandy Ramirez, and Plant Manager Gosney to "review the facts[ and] the plan with both of them." (St. Pierre Dep. at 57, #205). Apparently, St. Pierre "went to [Ramirez] first to make sure we were all on the same page and then, you know, presented it to [Gosney] … as the authority."[1] (*Id.*). The record does not indicate when St. Pierre met with Ramirez and Gosney. But after that meeting, on February 18, 2017, Ramirez called Smith and informed him that APF had terminated his employment. (Smith Dep. at 137–38, #114; *but see* St. Pierre Decl. at ¶¶ 24, 25, #305–06).

## PENDING MOTION

Smith filed this suit against APF on April 6, 2018, alleging APF violated the Family Medical Leave Act ("FMLA"), the Age Discrimination in Employment Act

---

[1] There is some confusion regarding Smith's testimony about who ultimately decided to fire him. Smith testifies Mason said that St. Pierre had spoken to Gosney about firing him, and so Smith concluded that St. Pierre and Gosney (or perhaps just Gosney) had taken part in the decision. (*See* Smith Dep. at 141–42, #115). Yet St. Pierre states that he alone decided to fire Smith but first spoke to Ramirez and Gosney (and provided Smith's PIP to them) before HR informed Smith of his decision. (St. Pierre Dep. at 53–54, #201–02) St. Pierre also testifies, however, that he presented his decision to Gosney "as the authority." (*Id.* at 57, #205). Adding to the confusion, St. Pierre's Declaration states "I presented *his* decision to Plant Manager Chris Gosney and HR [R]epresentative Mandy Ramirez to inform them of *his* decision and confirm their agreement with the documentation. However, the ultimate decision to terminate Smith's employment remained with me." (St. Pierre Decl. at ¶ 26, #306).

("ADEA"), the Americans with Disabilities Act ("ADA"), and similar Ohio laws by terminating Smith because of his age (56, at the time APF fired him), his disabilities (high blood pressure, stress, anxiety, and depression), in retaliation for his complaints to HR about age discrimination, and in retaliation for exercising his FMLA rights (taking leave). (*See* Smith Compl., Doc. 1, #1–7; Smith Dep. at 143, #115). Smith also alleges APF interfered with Smith's FMLA rights by disciplining him for actions that took place while he was on leave. (Smith's Compl. at ¶¶ 21, 23, #3–4). APF now moves for summary judgment on all Smith's claims.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine disputes of material fact, which he may do by demonstrating that the non-moving party lacks evidence to support an essential element of his claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).

In response to the movant's showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). In other words, the existence of a "mere scintilla of evidence" in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury reasonably

could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). That being said, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Finally, in conducting the summary judgment analysis, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from making credibility determinations or weighing evidence).

## LAW AND ANALYSIS

In his Complaint, Smith alleges that APF: discriminatorily terminated him under the ADEA (age), ADA (disability), and Ohio laws (age & disability); retaliatorily terminated him under the FMLA (for taking leave) and ADEA (for complaining about age discrimination); and interfered with his rights under the FMLA. As noted, APF has now moved for summary judgment on all of these claims. In his Memorandum in Opposition to that motion, however, Smith combines his arguments for these distinct alleged legal claims into a single framework that he

11

labels "wrongful termination." (Smith Mem. in Opp'n at 9, Doc. 26, #343).[2] Although Smith's claims arise from multiple different statutes, there is no direct evidence of any form of discrimination in this case and so the *McDonnell Douglas* burden-shifting framework applies to each claim. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283, 288 (6th Cir. 2012) (age discrimination and retaliation under the ADEA and Ohio law); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001) (retaliation under the FMLA); *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319–20 (6th Cir. 2019) (disability discrimination under the ADA).

Under the *McDonnell Douglas* burden-shifting framework, to overcome APF's motion for summary judgment, Smith must identify evidence from which a reasonable jury could conclude that he has demonstrated one or more of four separate prima facie cases: (1) discrimination under the ADA, (2) discrimination under the ADEA, (3) retaliation under the ADEA, and (4) retaliation under the FMLA. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). For each claim as to which he can meet his burden of showing a genuine dispute as to the existence of a prima facie case, the burden then shifts to APF to articulate a legitimate, nondiscriminatory reason for Smith's termination. *Id.* at 802–04. If APF can do so, the burden shifts back to Smith to show that there is sufficient evidence to create a

---

[2] In doing so, Smith did not address his FMLA interference claim in his Memorandum in Opposition to APF's Motion for Summary Judgment. Sixth Circuit case law makes clear that a plaintiff abandons a claim when he fails to address it in response to a motion for summary judgment. *Brown v. NHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases). Smith thus abandoned his FMLA interference claim against APF.

jury question as to whether APF's articulated reason is pretext to mask its discrimination or retaliation.[3] *Id.* at 804–06.

## I.    Smith's Discrimination Claims

### A.    Smith Has Not Identified Evidence From Which A Reasonable Jury Could Conclude That He Met The Prima Facie Case For His Age Discrimination Claims Under the ADEA and Ohio Law.

The ADEA prohibits employers from firing employees who are forty years old or older because of their age. 29 U.S.C. § 623(a)(1); *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (6th Cir. 2015). To establish an ADEA claim, Smith must show that his age was a "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). He can make this showing with either direct or circumstantial evidence. *Liebman*, 808 F.3d at 1298. Here, Smith does not try to satisfy his burden with direct evidence. Instead, he relies on indirect evidence, and so the *McDonnell Douglas* burden-shifting framework applies. *Miles v. South Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020) (citation omitted).

To establish a prima facie case of age discrimination, Smith must show evidence that, if believed by the jury, would establish four elements: (1) he was at least 40 years old at the time of the alleged discrimination, (2) APF discharged him, (3) he was otherwise qualified for the position that he held, and (4) there are "circumstances that support an inference of discrimination." *Willard v. Huntington*

---

[3] For a more complete discussion of the Court's understanding of the burden of proof at the summary judgment stage under the *McDonnell Douglas* burden-shifting framework, *see Burress v. Spring Grove Cemetery & Arboretum*, No. 1:18-cv-879, 2020 WL 3036047, at *8–9 (S.D. Ohio June 5, 2020) (Cole, J.).

*Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020) (citations omitted). Here, the parties disagree only as to the third and fourth elements.

Regarding the third element, APF argues that Smith was not qualified to be a Co-Supervisor because, after St. Pierre implemented the Preventative Maintenance initiative, Smith failed to meet legitimate job performance expectations. APF points out that Smith received coaching from St. Pierre throughout 2016 and was placed on the Performance Improvement Plan at the end of that year, and yet his work was still inadequate. For example, APF asserts, Smith defied St. Pierre's instructions to prioritize Preventative Maintenance and failed to implement specific daily procedures among his team.

In response, Smith argues that he was qualified for the position, given that St. Pierre described him as a "talented, experienced employee" and because Smith held the position for over 20 years. (Smith's Mem. in Opp'n at 9–10, #343–44). Smith also contends that APF cannot rely on the fact that they fired him as a basis for now asserting that he was unqualified for his position, as otherwise, every time an employee was terminated, the fact of the termination would mean that the termination was not discriminatory. The latter argument mischaracterizes APF's argument, though, as APF is not maintaining that the *fact* it fired Smith shows that Smith was not qualified, but rather that the same reasons found in the record evidence that gave rise to the termination decision also support a finding that Smith was not qualified.

14

But just because Smith missed the mark when summarizing APF's argument, does not mean that he failed to address its point. Rather, Smith correctly notes that, in *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) (en banc), the Sixth Circuit warned that, in assessing whether a plaintiff has met the burden on his prima facie case of showing he is qualified for his position, a court may not consider the alleged nondiscriminatory reason that the employer provides for terminating the employee. *See id.* at 574–75 ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff.") (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000)). Rather, the *Wexler* court explained, the inquiry as to whether a plaintiff was qualified "should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required skills." *Id.* at 576. And "[t]he prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting [such] credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id.* at 575–76.

Applying these standards, and upon reviewing the relevant evidence, the Court finds that Smith was qualified for the position. Look no further than St. Pierre's view on the matter. (St. Pierre Dep. at 45, #193). According to St. Pierre, Smith "was a very talented, experienced employee … [who] knew a lot. Not only that, he knew the

15

equipment, he knew how it worked, he knew how to fix it." (*Id.*). Plus, Smith had worked at APF (and its predecessor) for 25 years, and for 22 of those years he was a Supervisor, the very position from which he was fired. That seems to be enough to create at the very least a jury question as to whether he was qualified. *See Millen v. Oxford Bank*, 745 F. App'x 609, 613 (6th Cir. 2018) (finding the plaintiff was "clearly qualified" for the position given her 23 years at the company and 7 years in the manager position). And although Smith admitted that he and the Maintenance Department were falling behind in completing tasks, as APF points out, that was *before* Smith took FMLA leave in August 2016 and thus also prior to Mason joining the first shift as a Co-Supervisor. In other words, Smith and St. Pierre agreed that at least some of the difficulties that Smith and the Maintenance Department were experiencing prior to August 2016 related to the overwhelming nature of the supervisory duties—not Smith's performance of those duties. Moreover, St. Pierre also admitted that Smith was a "talented, experienced employee." That also would support a jury finding that Smith was qualified. Accordingly, Smith has identified sufficient evidence to satisfy the third element of his prima facie age discrimination claim at the summary judgment stage.

To satisfy the fourth element, Smith would typically be required to show either that APF replaced him with a younger worker or, alternatively, that APF treated similarly situated, non-protected employees more favorably. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521–22 (6th Cir. 2008); *Tuttle v. Metro. Gov't of Nashville*, 474

F.3d 307, 317 (6th Cir. 2007).[4] APF mixes the two separate required showings into one, arguing that the record evidence does not support the fourth element because, although a younger employee (Co-Supervisor Mason) ultimately replaced Smith, Mason was not similarly situated given that, unlike Smith, he did not have a history of failing to complete Preventative Maintenance priorities, was never placed on a PIP, and did not openly defy St. Pierre's instructions. That is, APF does not dispute that Mason replaced Smith, but instead argues that the two were not similarly situated. That argument is a losing one, though, because Smith can prevail on the fourth element by showing *either* Mason (a substantially younger person) replaced him *or* that Mason was similarly situated but was treated better. *Tuttle*, 474 F.3d at 317. Thus, the Court must address these two issues separately.

First, the Court must determine whether Mason replaced Smith. The record evidence shows that he did not. Sixth Circuit law is clear that "an employee's assumption of a terminated co-worker's job duties does not constitute replacement for purposes of an ADEA claim." *Blizzard*, 698 F.3d at 283–84. *See also Grosjean v. First Energy Corp.*, 349 F.3d 332, 335–36 (6th Cir. 2003) ("A 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already

---

[4] While these are the typical ways of meeting the fourth prong in an age discrimination case, Sixth Circuit caselaw at least suggests that other forms of evidence may suffice, as well. For example, ageist comments that fall short of meeting the test for direct evidence of discrimination may suffice to establish the fourth prong of the *McDonnell Douglas* prima facie case. *See Pelcha v. MW Bancorp, Inc.*, No. 1:17-cv-497, 2020 WL 1904714, *8–11 (S.D. Ohio Apr. 17, 2020) (Cole, J.) (collecting cases). Here, though, the only two types of evidence either side discusses are the two "typical" categories discussed above. Thus, the Court need not consider what other types of evidence may suffice.

performing related work.'") (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). "Rather, a person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Blizzard*, 698 F.3d at 284 (citations and internal quotation marks omitted). Cases like *Blizzard* and *Grosjean* preclude a finding of replacement here. Mason was Smith's Co-Supervisor, a role he first assumed when Smith took FMLA leave beginning on August 26, 2016. Upon Smith's return from leave in October 2016, St. Pierre kept both Mason and Smith as Co-Supervisors, as St. Pierre had concluded that the first-shift Maintenance Supervisor's duties were "too much" for one person. (St. Pierre Dep. at 27, #175). St. Pierre and Smith agree about those core facts. (Smith Dep. at 175, #123). Likewise, there is no dispute that Mason continued working as a first-shift Maintenance Co-Supervisor after APF terminated Smith or that APF—despite trying—never hired another permanent first-shift Co-Supervisor. (St. Pierre Dep. at 49, #197). Thus, while Mason *assumed* co-worker Smith's job duties after Smith's termination, Mason did not *replace* Smith. *See Blizzard*, 698 F.3d at 284. Alternatively, to use the formulation from *Grosjean*, another employee (Mason) was "assigned to perform the plaintiff's duties in addition to other duties," or, phrased differently, Smith's work was "redistributed among other existing employees", i.e., Mason, who was "already performing related work." 349 F.3d at 335–36. That is not a "replacement."

Further confirming that the replacement angle won't work for Smith, while APF did not hire a permanent Maintenance Co-Supervisor, it did name an employee to temporarily fill that position after Smith's termination. Even if this temporary

reassignment constituted a "replacement," the employee at issue was APF Planning Supervisor, Wayne Durbin, who was 70 years old at the time. (St. Pierre Dep. at 51, #199). Thus, reference to Durbin does not support an inference that APF discriminated against Smith because of his age. Accordingly, Smith cannot establish the fourth prong on the basis of his replacement, or lack thereof.

That is not the end of the inquiry, though, as Smith could alternatively satisfy the fourth prong by showing that he and Mason were similarly situated, with Mason being treated differently because he was younger. To count as "similarly situated," Smith must demonstrate that the comparable employee (Mason) is similar "in all *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (citations omitted). That means Smith must show that he and Mason reported to the same supervisor (St. Pierre), were subject to the same standards, and, most importantly here, engaged in the same conduct without any differentiating or mitigating circumstances that would distinguish their conduct or APF's treatment of them for it—sometimes referred to as the *Mitchell* factors. *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "Although other factors may also be relevant, depending on the facts of each case, the *Mitchell* factors are generally relevant." *Johnson*, 942 F.3d at 331 (citing *Ercegovich*, 154 F.3d at 352) (internal citation omitted). In other words, here, Smith must show that Mason was a younger worker who performed a similar job and did so in roughly the same manner that led

to Smith's termination, but who himself did not suffer the same adverse employment consequences.

With that goal in mind, Smith argues that he and Mason are similar in every way but age—they held the same job, shared virtually identical responsibilities, and were both managed by St. Pierre. The only differences between them, in Smith's view, were that Mason was 40 (younger than Smith), was not disabled, never took FMLA leave, and was not terminated or disciplined by APF (the latter three, while not directly relevant to Smith's age discrimination claim, could be relevant to the other forms of discrimination he claims, as discussed below).

Smith's argument, though, suffers from a crucial flaw—it underrates the aspects of his and Mason's employment that are relevant here. That is, the similarly-situated analysis may include considerations of documented job performance or misconduct, when those aspects of the plaintiff and comparator are relevant to their job statuses. *Mitchell*, 964 F.2d at 583; *see Henry v. Abbott Labs.*, 651 F. App'x 494, 501–02 (6th Cir. 2016) (finding that job performance that occurred prior to the adverse action is relevant to the similarly situated analysis). Here, Mason and Smith were not similarly situated from the standpoint of job performance, prior misconduct, or disciplinary history. As APF observes, Mason did not have a documented history of failing to complete assigned tasks, particularly the Preventative Maintenance initiative, and was not placed on a PIP. Moreover, as APF also notes, Mason—who attended the February 11th meeting with Smith, St. Pierre, and the Maintenance Department staff—did not openly defy St. Pierre's instructions. That difference

20

matters. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 729–30 (6th Cir. 2004). Accordingly, Smith has not established that APF treated a similarly situated younger employee more favorably.

In sum, the undisputed facts show that: (1) Smith was not replaced by a younger worker, and (2) Smith has not identified a similarly-situated younger employee who received better treatment. Nor has Smith proffered any other evidence to satisfy the fourth prong of the *McDonnell Douglas* prima facie test. Accordingly, his age discrimination claim fails.

### B. Smith Has Established A Prima Facie Case For His Disability Discrimination Claims Under The ADA And Ohio Law, But His Claim Fails As A Matter Of Law At The Pretext Stage.

#### 1. Smith Meets The Prima Facie Case Requirement For His ADA Claim.

In his Complaint, Smith alleges two general disability discrimination claims. First, he titles Count Four "Disability Discrimination in Violation of the [ADA]," but does not mention any particular sections of the ADA that APF has allegedly violated. (*See* Pl.'s Compl. at 5–6, #5–6). Rather, Smith asserts that APF terminated him "based upon his disability and/or perceived disability in violated [sic] of Chapter 4112 of the Ohio Revised Code." (*Id.* at ¶ 43, #6). Smith then re-alleges in Count Five, titled "Disability Discrimination in Violation of Ohio Revised Code Chapter 4112," that APF terminated Smith "based upon his disability and/or perceived disability in violated [sic] of Chapter 4112 of the Ohio Revised Code." (*Id.* at ¶ 49, #6).

There are many types of ADA claims, *see Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 817 (6th Cir. 2020), and so Smith's omission of the legal basis for Count

Four is problematic. APF seems to argue that Smith proceeds under Title I of the ADA, which applies to private and public employers. *See Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315 (6th Cir. 2012) (en banc). Because Smith does not dispute that characterization, the Court analyzes Smith's ADA claim as one arising under Title I. And his Ohio disability discrimination claims rise or fall on the resolution of that federal ADA claim. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 848 n.1 (6th Cir. 2018).

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to … [the] discharge of employees[.]" 42 U.S.C. § 12112(a). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Id.* § 12111(8). Thus, disability or not, an employee must be able to perform the "fundamental job duties." 29 C.F.R. § 1630.2(n)(1). In analyzing Title I ADA discrimination claims, two rubrics may apply, depending on whether the plaintiff relies on direct or indirect evidence of discrimination. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016). Here, as discussed above, the parties agree that there is no direct evidence of discrimination in this case. Thus, the Court will analyze whether the record evidence demonstrates disability discrimination through indirect evidence, again through the lens of the *McDonnell Douglas* burden-shifting approach.

As was the case with his age discrimination claim, for Smith to overcome APF's motion for summary judgment, he must first establish a prima facie case for his

disability discrimination claim. To do so, Smith must identify sufficient record evidence so that a reasonable jury could find that: (1) he is disabled; (2) he was otherwise qualified for the position; (3) he suffered an adverse employment action; (4) APF knew or had reason to know of his disability; and (5) APF replaced him or his position remained open while APF sought other applicants. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) (citation omitted). Furthermore, there must be evidence from which a jury could conclude that Smith's disability was "a 'but for' cause of the adverse employment action." *Id.* (citing *Lewis*, 681 F.3d at 318). APF argues that Smith cannot establish the first or fourth prongs—i.e., that Smith is disabled, or that APF knew or had reason to know of the alleged disability at the time of the alleged adverse action. As for the uncontested prongs that APF does not address, the Court notes that each one is met here. That is, Smith was otherwise qualified for his position (prong two), APF fired Smith (prong three), and, after firing Smith, his previous first-shift Maintenance Co-Supervisor position remained open (prong five). (*See* St. Pierre Dep. at 51–52, #199–200). Thus, the Court need only address the remaining two contested prongs.

Regarding the first prong, the ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Major life activities include seeing, concentrating, thinking, communicating, caring for oneself, and working. *Id.* § 12102(2)(A). And "'major' shall not be interpreted strictly to create a demanding standard." 29 C.F.R. § 1630.2(i)(2). To determine whether a purported disability substantially limits at least one major

life activity, courts must compare the person claiming a disability to "most people in the general population." *Id.* § 1630.2(j)(1)(ii). Smith testifies that his work-related stress caused him to experience problems with his vision. (Smith Dep. at 150–51, #117). In fact, he asserts that the principal reason he took FMLA leave was because his vision was blurred to the point that he could not read anything. (*Id.*). That is enough to show that Smith's stress is a "disability" for ADA purposes. *See Hostettler*, 895 F.3d at 854 ("So long as the impairment 'would substantially limit a major life activity when active,' that is enough.") (quoting 42 U.S.C. § 12102(4)(D)). And APF's argument that Smith was not disabled because he testified that he could physically complete his job without accommodation is unavailing. That testimony goes to whether Smith was qualified, not whether he was disabled. *See Hostettler*, 895 F.3d at 854. Smith has thus established the first of the two contested elements of his prima facie disability discrimination claim.

Next, APF argues that Smith cannot establish the fourth element—that St. Pierre knew Smith was disabled—based on the record evidence. Here, APF gets the law right: "An employee cannot be subject to an adverse employment action based on his disability unless the individual decisionmaker responsible for his [adverse action] has knowledge of that disability." *Tennial*, 840 F.3d at 306 (citation omitted). But APF is wrong about the facts, as there is evidence from which a jury could conclude that St. Pierre knew of Smith's difficulties with his vision. (*See* Smith Dep. at 148–52, #116–17; *see id.* at 150–51, #117 ("I was having trouble seeing. I explained that to [St. Pierre]. That was the biggest reason I wasn't working is I couldn't see. …

So, that's what I told him." "Did you talk to [St. Pierre] about the stress, anxiety and depression?" "I talked to him about the whole diagnosis, yeah."); *see also* St. Pierre Dep. at 45–46, #193–94 ("Did [Smith] complain to you about kind of the stressful environment and the working conditions and the hours and things like that?" "Yes, we, I recall talking about that. … I know [Smith] was struggling with the stress of the whole thing and I was coaching him about … how to work through that.")). Thus, Smith has satisfied his prima facie case for disability discrimination.

### 2. APF Has Proffered Legitimate, Non-Discriminatory Reasons For Terminating Smith's Employment.

Once the plaintiff establishes a prima facie case, the burden shifts to APF to provide a legitimate, nondiscriminatory reason for firing Smith. *McDonnell Douglas*, 411 U.S. at 802–04. APF asserts that it fired Smith for his ongoing refusal to comply with the Preventative Maintenance initiative that St. Pierre sought to implement and for openly defying St. Pierre's orders regarding that same program. The Sixth Circuit has long recognized that sub-standard job performance and/or insubordination are legitimate, non-discriminatory reasons for firing employees. *See Fullen v. City of Columbus*, 514 F. App'x 601, 606 (6th Cir. 2013) (collecting cases). APF has thus satisfied its burden on this issue.

### 3. Smith Fails To Show That A Reasonable Jury Could Find APF's Proffered Reasons For Firing Smith Are Pretextual.

Once an employer has proffered a legitimate, non-discriminatory reason for the adverse action, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could determine by a preponderance of the evidence that the

25

proffered explanation was a pretext for discrimination. *Ercegovich*, 154 F.3d at 354. Smith can do this by showing APF's proffered reasons for terminating him: (1) have no basis in fact, (2) did not actually motivate the APF's decision to terminate him, or (3) were insufficient to warrant his termination. *Wexler*, 317 F.3d at 576. Regarding his disability discrimination claims, Smith touches only on the first theory.[5]

That is, Smith argues that APF's proffered reason for firing him—because he failed to meet performance expectations and was insubordinate—has no basis in fact. For support, Smith contends that his PIP reflects that he met all St. Pierre's expectations and that he never received any additional discipline, coaching, or warnings. The record, however, demonstrates otherwise. For example, Smith's 2016 Goals and Performance Review shows that Smith failed to meet four of his six objectives after returning from leave. (*See* St. Pierre Dep., Ex. D, #278). And, contrary to Smith's assertion that he met all St. Pierre's expectations, his Review (which Smith signed) indicates that Smith "[m]et some expectations for his competency, but was less consistent than desired." (*Id.*, #279). That review also reflects that Smith had

---

[5] In his Memorandum in Opposition, Smith combines his arguments regarding pretext *for all his claims*, that is, his FMLA retaliation claims, age retaliation claims, age discrimination claims, and disability discrimination claims. In doing so, Smith argues in a single section that: (1) APF's proffered reasons for terminating him are untrue; (2) "ample evidence of animus [as to Smith's age] exists"; (3) the temporal proximity between Smith's medical leave and PIP, as well as Smith's age discrimination complaint and his termination show that the proffered reasons for those adverse actions are pretextual; and (4) "APF's far-more favorable treatment of a direct comparator is more than enough to get this case to a jury." (Smith's Mem. in Opp'n at 11, #345). This scattergun approach does not do Smith any favors in addressing the question presented at this stage of the *McDonnell Douglas* framework on his disability discrimination claim. That is—in the context of Smith's disability discrimination claim, which is the only claim as to which Smith has established a prima facie case, and thus reached the pretext stage—are APF's proffered reasons for terminating Smith pretext? The Court seeks to address solely that question here, rather than considering whether this case involves some kind of general free-floating pretext as to the claims as a whole.

"not bought into" the Preventative Maintenance initiative, had not held his team accountable for Preventative Maintenance completion rates, and was not effectively communicating with others. (*Id.*, #278–79). Smith's testimony that, leading up to February 10, 2017, his team had not been performing daily inspections, substantiates his Review. (Smith Dep. at 86–90, #101–02).

Moreover, the events that occurred *after* the review further support the performance concerns. As noted above, a bolt fell off a machine as to which Smith was responsible for maintenance. That required a shutdown, a shutdown that in his Supervisor's view resulted from Smith's failure to implement the Preventative Maintenance program, as instructed. In light of all of that, Smith has not shown that the first of APF's proffered reasons—insufficient performance—has no basis in fact.

With regard to APF's other proffered reason—insubordination—Smith denies that he was insubordinate during the February 10, 2017 meeting, or at any other time. According to him, St. Pierre simply has a terrible memory or was confused, (Smith's Mem. in Opp'n at 11, #345), and, in contrast, Smith clearly remembers that he was never insubordinate in that meeting. (*Id.* at 12, #346). But again, the record evidence shows otherwise. As discussed above, Smith testifies that he told the first-shift team that the mechanics had to inspect the machines each day prior to starting the production lines, "whether we agree or not[.]" (Smith Dep. at 89, #102). Smith also testifies that he thought inspections were "very taxing" on his team and so he sought to find a solution that would not "overwhelm[] the mechanics, as well as compromis[e] startup[.]" (*Id.* at 90, #102; *id.*, Ex. at 2, #130). Thus, Smith's own

27

testimony seems to reflect that Smith told his team that he disagreed with St. Pierre's decision to inspect the machines each day and that he was working on finding a different approach than the one St. Pierre had selected. That is enough to substantiate St. Pierre's conclusion that Smith was insubordinate to St. Pierre. (The Court is not asserting that Smith was factually wrong in his concerns about St. Pierre's preferred approach. The Court has no view on that subject. Rather, the point is merely that insubordination consists of the act of defying one's supervisor. Thus, whether Smith's observations were correct or not, he was still defying St. Pierre and thus acting insubordinately.) Accordingly, Smith has failed to satisfy his burden to produce sufficient evidence from which a jury could reasonably reject APF's proffered reason for firing him. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). For that reason, Smith cannot establish that APF inappropriately discriminated against him on the basis of his alleged disability.

## II.     Retaliation Claims

In addition to discrimination claims, Smith also advances retaliation claims. In these claims, Smith is not asserting that the company took adverse action against him based on, for example, his age or disability, but rather based on his exercise of legal rights that he has under the ADEA and FMLA. Although these claims are not discrimination claims per se, the analysis at summary judgment follows the same *McDonnell Douglas* burden-shifting approach. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (holding that *McDonnell Douglas* burden-shifting framework applies to retaliation claims predicated on anti-discrimination statutes). As with

28

discrimination claims, the burden is first on the plaintiff to show evidence from which a jury could find that the plaintiff has established a prima facie case (of retaliation). Here, Smith fails to meet the prima facie case requirement as to either of the two asserted retaliation claims.

### A. Smith Cannot Satisfy The Prima Facie Case For His Retaliation Claims Under the ADEA and Ohio Law.

Smith alleges that APF retaliatorily fired him for complaining to HR Rep. Chernock about APF's discriminatory practices based on its employees' ages. The ADEA prohibits employers from retaliating against an employee for opposing or reporting age discrimination. 29 U.S.C. § 623(d). Similarly, Ohio law forbids any person from discriminating against another person because that person has opposed any unlawful discriminatory practice. Ohio Rev. Code § 4112.02(I).

To establish a retaliation claim under federal or Ohio law, Smith must identify evidence from which a jury could conclude that: (1) he engaged in protected activity; (2) the decisionmaker knew that Smith engaged in the protected activity; (3) Smith suffered an adverse employment action; and (4) there was a causal connection between the protected activity and his termination. *Blizzard*, 698 F.3d at 288. As with age discrimination claims, if Smith can establish a prima facie case of retaliation, the burden of production shifts to APF to offer a non-discriminatory reason for the adverse action. *Id.* (quoting *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009)). If APF does so, then the burden shifts back to Smith to establish that APF's proffered reason was pretext. *Id.*

29

As to the prima facie case, APF argues that Smith's retaliation claims fail because there is no record evidence to support either the second or the fourth prong. Because the Court agrees with APF regarding the second prong, the Court need not, and thus does not, address the fourth prong.

In order to establish the second prong of the prima facie case, Smith must identify evidence that creates at least a genuine dispute as to whether the relevant decisionmaker (i.e., the person who made the termination decision) had knowledge that Smith had engaged in the protected activity at issue (Smith's purported complaints to Chernock about age discrimination). *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016). In fairness, there is a disputed question of fact relating to Smith's reporting activities—but that dispute goes only to whether Smith made the complaints to Chernock at all. Smith testified that he believes that during his call to Chernock to "vent" about the February 10th meeting, he also raised concerns about Gosney's alleged treatment of older APF employees. Chernock, on the other hand, avers that Smith only raised his concerns about the former. While those accounts of the call vary, they do not create a genuine dispute as to any fact that is material to the analysis here. That is because the undisputed evidence shows that St. Pierre, who testified that he was the person who decided to first Smith, did not know about the call between Smith and Chernock *at all* at the time St. Pierre made that decision. (St. Pierre Decl. at ¶ 27, #306 ("I had no knowledge of Smith's call to Chernock on February 11[, 2017,] or any allegation by Smith that older workers were being treated unfairly.")). Thus, St. Pierre perforce could not have known the nature

30

of the conversation that occurred on a call of which he was unaware. So, even assuming that Smith raised age discrimination concerns on that call, Smith has failed to create a genuine dispute as to whether St. Pierre knew Smith had done so.

Nor can Smith point to a potential dispute as to the identity of the relevant decisionmaker as a means of avoiding this problem. As noted above (*see supra* at n.1), there is some evidence in the record that Gosney or HR Director Ramirez may have had some input in the termination decision. St. Pierre asserts that he was the "ultimate authority," but, even if those two individuals were involved, there is likewise no evidence in the record that either of them was aware of Smith allegedly sharing age discrimination concerns with Chernock. The only testimony about discussions of alleged age discrimination (and it comes from Smith himself), is that he told Chernock. She disagrees, but putting that aside, there is simply no record evidence even suggesting that she told anyone else of that call or the concerns that Smith had allegedly raised during it.

Accordingly, whether the decisionmaker was St. Pierre, Gosney, or Ramirez, or some combination of the three, Smith does not have any evidence showing that they knew of his alleged complaints about age discrimination. As a result, he cannot show the second prong of a prima facie case for retaliation. And, as Smith cannot establish a prima facie case for ADEA retaliation, that claim fails.

### B. Smith Cannot Satisfy The Prima Facie Case For His Retaliation Claim Under the FMLA.

Smith also brings a retaliation claim under the FMLA. He asserts that APF retaliated against him for exercising his FMLA rights because St. Pierre issued the

PIP to him after he returned from leave on October 24, 2016. Smith's basic argument is that his leave, rather than his admittedly poor performance from February 2016 to August 26, 2016, is what actually motivated St. Pierre to issue the PIP and subsequently terminate him. As with his other claims, Smith does not present any direct evidence of such retaliation, and thus the *McDonnell Douglas* burden-shifting framework applies. *Tennial*, 840 F.3d at 308.

To establish a prima facie case of FMLA retaliation, Smith must present sufficient evidence from which a jury could find that: (1) he engaged in an activity protected by the FMLA; (2) APF knew that he engaged in that protected activity; (3) APF then took an adverse action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Tennial*, 840 F.3d at 308. APF contends that Smith cannot establish the second and fourth elements. The Court limits its analysis to the fourth element.

In assessing causation, a threshold question is exactly what adverse action Smith relies on as allegedly retaliatory. Smith offers two options—the PIP and his termination. As to the first, the record does not support Smith's claim that being assigned a PIP constituted an adverse action against him based on his FMLA leave. That is because there is no dispute that St. Pierre decided to issue Smith a PIP *before* Smith announced that he was taking leave on August 26, 2016. Prior to Smith's announcement, St. Pierre decided a PIP was necessary because Smith had struggled in June, July, and August 2016 to implement the Preventative Maintenance initiative, despite St. Pierre's support and coaching throughout that time. Because

32

the decision to place Smith on a PIP occurred before Smith announced any intention of taking FMLA leave, the latter simply could not have caused the former.

Smith likewise fails to show a causal link between his leave and his subsequent termination. To establish causation, Smith must show that APF had some type of retaliatory intent. *Tennial*, 840 F.3d at 308. That is, Smith must demonstrate that his taking leave is what motivated St. Pierre to fire him. *Id*. In that regard, Smith argues that the temporal proximity between the day he took FMLA leave (August 26, 2016) and the day APF terminated him (February 18, 2017) indicates that the former caused the latter.

Sixth Circuit caselaw is unfortunately less than clear on whether, or in what circumstances, the temporal proximity between a plaintiff engaging in protected activity and then later suffering an adverse action can, by itself, satisfy the causation prong of a plaintiff's prima facie case. Some cases, for example, appear to adopt a bright-line rule that "temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) ("Closeness in time is one indicator of a causal connection, … but temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim.") (citations omitted); *see Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 471–72 (6th Cir. 2012) (noting that the Sixth Circuit has "repeatedly cautioned against inferring causation based on temporal proximity alone").

Another line of cases, though, seems to suggest that temporal proximity alone *can* be enough, at least if the time gap is short. *See Mickey*, 516 F.3d at 525–26. As the Sixth Circuit put it in *Mickey*, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.* at 525; *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). So, for example, "where an employer fires an employee immediately after learning of a protected activity, [courts] can infer a causal connection between the two actions, even if [the plaintiff] ha[s] not presented other evidence of retaliation." *Mickey*, 516 F.3d at 525. "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* Other case law in this latter line suggests that the dividing line between the close-enough-that-no-other-evidence-is-necessary category and the plaintiff-needs-more-than-mere-proximity category is approximately ten weeks. *See Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 319 (6th Cir. 2018) (collecting cases and finding that the Sixth Circuit draws the line for temporal proximity alone satisfying causation at just shy of the ten-week mark).

Here, the Court need not select between these competing Sixth Circuit approaches to temporal proximity as evidence of causation, as Smith cannot prevail under either. Smith presents no evidence suggesting that APF had some retaliatory

34

motive for firing him beyond the alleged temporal proximity between his exercise of FMLA rights and his later termination. So, assuming temporal proximity alone can be enough, Smith must convince the Court that the temporal proximity between the events is "very close," *Mickey*, 516 F.3d at 525, or, in other words, something on the order of ten weeks. *See Stein*, 730 F. App'x at 319.  He cannot do so. The nearly six months that passed between Smith's request for leave and his termination precludes a finding that temporal proximity is itself enough to establish a causal connection. As Smith has tendered no other evidence of causation, he has failed to make out a prima facie case for retaliation under the FMLA.

## CONCLUSION

Smith made the necessary showing on the prima facie case for his disability discrimination claims under the ADA and Ohio law. Those claims still fail, however, as APF then articulated legitimate, non-discriminatory reasons for firing him, reasons that Smith failed to show were pretextual. Smith's other causes of action fail as he cannot meet the prima facie case for his age discrimination and retaliation claims under the ADEA and Ohio law, or his retaliation claim under the FMLA and Ohio law. And Smith abandoned his only remaining claim, for FMLA interference.

Thus, for the reasons above, the Court **GRANTS** APF's Motion for Summary Judgment (Doc. 22), **DISMISSES WITH PREJUDICE** Plaintiff Mark Smith's claims, and **DIRECTS** the Clerk to enter judgment accordingly.

     **SO ORDERED.**

June 26, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**